COMMONWEALTH of Pennsylvania, **DEPARTMENT OF TRANSPORTATION, Petitioner,**

v.

**UNEMPLOYMENT COMPENSATION BOARD OF REVIEW, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs June 16, 2000.

Decided July 14, 2000.

Chester J. Karas, Jr., Pittsburgh, for petitioner.

Maribeth Wilt-Seibert, Harrisburg, for respondent.

Before PELLEGRINI, J., FLAHERTY, J. and McCLOSKEY, Senior Judge.

PELLEGRINI, Judge.

The Commonwealth of Pennsylvania, Department of Transportation (PennDot) appeals from an order of the Unemployment Compensation Board of Review (Board) reversing the Referee's decision and granting unemployment compensation benefits to George D. Brocious (Claimant) because he was not guilty of willful misconduct.

Claimant was employed for approximately 27 years by PennDot and last worked for PennDot as a county highway maintenance manager in Jefferson County, Pennsylvania. On May 2, 1986, Claimant applied to PennDot for permission to engage in supplemental employment which involved him establishing his own corporation, Edge Development Corporation, for the purpose of developing inventions. In his request, he stated he would work on ideas during the evenings, weekends and in his spare time. He also indicated that his work could possibly be considered related to his current employment "if our corporation develops something related to highway maintenance. However, since my sphere of influence is confined to Jefferson County, no actual or apparent conflict exists as long as our corporation does no business with Jefferson County or with PennDOT." He also signed an affidavit providing certain assurances to PennDot that he would not use PennDot's time, resources or workplace for his supplementary employment,[1] and indicating that a violation of the affidavit could result in his dismissal. PennDot turned down Claimant's request, stating that more information was required to determine if he would be working on his inventions on PennDot's time. Claimant responded by resubmitting his request and assuring PennDot that his inventions would not be created during his work hours, but his request was still denied because he had failed to indicate whether his inventions would relate to Commonwealth business and, more specifically, whether they would be highway-related. After assuring PennDot that his

---

1. Specifically, the affidavit provided the following:

My signature below is evidence that I have read and fully understand that the following conditions apply to my supplementary employment:

1. I may not conduct business with any Commonwealth agency or other Commonwealth entity;

2. I may not use information or data obtained or derived from Commonwealth employment to further private business interests;

3. I may not accept private business conflicting with or accruing from Commonwealth employment;

4. I may not solicit work in connection with my supplementary employment during working hours or at Commonwealth facilities;

5. I may not use commonwealth property for my supplemental activities;

6. I must comply with Management Directives 205.8 and 205.14 and am prohibited from conducting any private business in Commonwealth offices at any time before, during or after normal working hours or anywhere during normal working ours; and

7. Violation of any of the above conditions may result in disciplinary action by the Department of Transportation including, but not limited to, suspension and/or dismissal.

The affidavit is signed by Claimant and is dated May 2, 1986.

inventions would not be related to Commonwealth business, on April 2, 1987, PennDot ultimately approved his request for supplementary employment. Claimant signed an affidavit on August 4, 1995, acknowledging that a violation of any of the conditions of his affidavit could result in his termination from employment. This was signed in conjunction with the Governor's Code of Conduct outlining the prohibition of using Commonwealth facilities, equipment and time to pursue a private business arrangement.

In 1995, Claimant and two of his coworkers, Wayne Snyder (Snyder) and Clifford Smith (Smith), developed a piece of machinery called a "side dozer" to solve the problem of clearing debris from under guide rails. They contracted with G & S Mining Repair Company (G & S), a private company owned by Smith's uncle, to build the components of the machine. PennDot, however, and not Claimant, paid G & S $1,200 to build the components. The "side dozer" was then assembled in PennDot's welding shop at its maintenance garage using PennDot's equipment and manpower. Claimant then patented the "side dozer" and assigned the patent to Edge Development, Claimant's company, which later assigned it to Seigworth Road Supply (Seigworth) in return for $600 for each "side dozer" Seigworth sold.

Because it observed PennDot using a "side dozer" of the type for which the patent was assigned by Claimant, Seigworth sent a Notice of Patent Infringement to PennDot alleging that PennDot was infringing on a patent assigned to Seigworth by PennDot's use of the "side dozer." PennDot, believing it held the patent for the "side dozer," began an investigation and found that Claimant had used PennDot's work time, worksite and materials to assemble the "side dozer."

As a result, PennDot terminated Claimant from his employment. In its May 14, 1999 termination letter to him, PennDot stated that while it had knowledge of his work on the project, it was never apprised of his intent to patent the machine he developed and convert it to his own use in connection with his pursuit of supplementary employment.

Claimant applied for unemployment compensation benefits with the Job Center which denied his request under Section 402(e) of the Unemployment Compensation Act (Law) [2] because his discharge was for willful misconduct. He appealed that decision. At the hearing before a Referee, PennDot provided the testimony of Snyder and Smith to prove Claimant's violations. Snyder, a mechanic supervisor for PennDot who had worked under Claimant for 18 years, testified that the "side dozer" was assembled on PennDot's time, in its weld shop and using some of Employer's materials. He also stated that testing was done on the completed machine on PennDot's time and that it could be used for highway maintenance. As to whether PennDot paid G & S for their work, Snyder responded that it did. Smith, a welder, testified that he put the pieces of the "side dozer" together at PennDot's maintenance facility using PennDot's welding equipment and doing so on PennDot's time which took approximately 30 hours. He also stated that he expected to receive a percentage of any commissions from the sale of any "side dozers."

PennDot also offered the testimony of Samuel Lamonto (Lamonto), Chief Labor Relations Division, Bureau of Personnel for PennDot, who was responsible for terminating Claimant from his employment. He testified that Claimant had never disclosed his intent to patent the "side dozer,"

**2.** Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended,* 43 P.S. § 802(e). That section provides:

An employe shall be ineligible for compensation for any week –

(e) In which his unemployment is due to his discharge or temporary suspension from work for willful misconduct connected with his work, irrespective of whether or not such work is "employment" as defined in this act.

and PennDot filmed the equipment and shared the video with other county maintenance organizations believing that its development was by and for the benefit of PennDot. He stated that PennDot would never have done this if it believed it would have exposed itself to patent infringement liability. Lamonto also testified that PennDot had been very clear in its expectations regarding the manner in which Claimant was to manage his supplemental employment activities, and it felt he had violated the assurances he had given Penn-Dot.

Claimant testified on his own behalf. He stated that the components of the "side dozer" had been made by G & S but admitted that they had been assembled in PennDot's weld shop utilizing its hydraulic cylinder. However, he denied that he had violated his supplemental employment agreement when he was developing, marketing or patenting the "side dozer" because he was not doing any business in Jefferson County. He also stated that he never tried to hide the fact that he had patented the machine and that PennDot had never informed him of any restrictions of patent rights. Further, Claimant did not believe that he had violated the affidavits or the Governor's Code of Conduct because he believed that he had done "a good thing" for PennDot by developing the technology that PennDot did not have the capabilities of developing but would benefit from. Although Claimant admitted that the "side dozer" was a highway maintenance piece of equipment, he denied that there was a potential for a conflict of interest with PennDot when he signed the affidavit, but only that there was a potential for the appearance of a conflict of interest. He also stated that his company, Edge Development, received $6,000 in commissions from the sales of the "side dozers"

but he had not personally received any income from the sales.

Finding that Claimant had violated the terms and conditions he had agreed to with regard to engaging in supplemental employment and that such behavior constituted willful misconduct, the Referee affirmed the decision of the Job Center and denied Claimant benefits. Claimant filed an appeal with the Board which reversed the Referee's decision relying on Claimant's testimony which it found credible. It then determined that PennDot had not met its burden of proving willful misconduct because:

> First, the claimant was discharged for his action in creating the side dozer, while the other employees were not discharged. Second, the claimant and his fellow employees did not invent the side dozer on Commonwealth time or while using Commonwealth resources. Third, the claimant did not enter into a business relationship with the Commonwealth, rather G & S entered into the business relationship with the Commonwealth. Fourth, the Commonwealth knew about the dozer in 1995, but did not discharge the claimant until 1999 and has not explained the delay.
>
> Therefore, while the Board in no way questions the employer's right to discharge the claimant, it cannot hold that the claimant's discharge was for willful misconduct in connection with his work.

This appeal by PennDot followed.[3]

■ PennDot contends that the Board erred in determining that it had failed to meet its burden of proving Claimant's willful misconduct because even based on Claimant's version of events, he still violated the affidavits and Governor's Code of Conduct because he admitted that he assembled the "side dozer" on PennDot's property using its materials and time.[4]

---

3. Our scope of review of a decision of the Board is limited to determining whether constitutional rights have been violated, whether errors of law were committed, or whether findings of fact are supported by substantial

evidence. *Phoebus v. Unemployment Compensation Board of Review*, 132 Pa.Cmwlth. 518, 573 A.2d 649 (1990).

4. Section 402(e) of the Law provides that an employee is ineligible for unemployment com-

The facts here are essentially undisputed – on PennDot's time and with PennDot's money, Claimant developed a machine that he patented for his personal benefit. This conduct violates the affidavits Claimant signed and constitutes willful misconduct.

Even if Claimant's use of PennDot's equipment and time violated his affidavits and the Governor's Code of Conduct constituting willful misconduct, Claimant, nonetheless, argues that because the Board found that his discharge was disparate treatment from that of Snyder and Smith, who were also involved in the invention, he is entitled to compensation. Claimant relies on this Court's holding in *Electric Material Company v. Unemployment Compensation Board of Review*, 664 A.2d 1112 (Pa.Cmwlth.1995) for the proposition that if there are two workers who are similarly situated and only one is terminated when the other is only reprimanded, the terminated employee's conduct does not constitute willful misconduct because he has received disparate treatment and is entitled to unemployment compensation benefits. In *Electric Material Company*, the claimant refused to work mandatory overtime and was terminated for insubordination while a co-worker who also refused to work overtime was merely disciplined but was not discharged. The claimant applied for unemployment compensation benefits which were granted and his employer filed an appeal. The referee reversed, finding the claimant ineligible for benefits for willful misconduct. The Board reversed, finding the claimant had received disparate treatment.

On appeal to this Court, we reversed after determining that while the employees performed the same type of work and both refused to work mandatory overtime, they were not similarly situated because their work records differed. The claimant who had been terminated had committed three violations of company policy in 18 months while the other employee did not have such a work record. We explained the following regarding disparate treatment as it related to unemployment compensation:

> This court has held that the essence of disparate treatment is not only whether unlawful discrimination has occurred but also whether similarly situated people are treated differently, based upon improper criteria. *American Racing [Equipment v. Unemployment Comp. Bd. of Review*, 144 Pa.Cmwlth. 310, 601 A.2d 480 (1991)]. In *American Racing*, an employer asked the claimant, a warehouse manager, to attend a five-day "sales blitz" in a neighboring state. The claimant refused, and his employer dismissed him for insubordination. Although the referee denied benefits on the basis of willful misconduct the Board reversed finding, *inter alia*, that the claimant was the subject of disparate treatment because he was discharged while two other employees were not discharged for the same conduct. On appeal to this court, we reversed. Specifically, we held that (1) the claimant, as manager of the warehouse, could not be considered similarly situated to the other two non-managerial employees whom the employer did not terminate; and (2) the employer did not treat the claimant differently based on any improper criterion. Instead, Employer based its decision on the claimant's level of responsibility as manager and on

---

pensation benefits when his unemployment is due to discharge from work for willful misconduct connected to his work. The employer bears the burden of proving willful misconduct in an unemployment compensation case. *Myers v. Unemployment Compensation Board of Review*, 533 Pa. 373, 625 A.2d 622 (1993). Willful misconduct has been defined as (1) an act of wanton or willful disregard of the employer's interest; (2) a deliberate violation of the employer's rules; (3) a disregard of standards of behavior which the employer has a right to expect of an employee; or (4) negligence indicating an intentional disregard of the employer's interest or a disregard of the employee's duties and obligations to the employer. *Id.*

business necessity, both of which the court deemed proper.

*Id.* at 1115.

 As in *Electric Material Company,* Claimant was the county highway maintenance manager and his level of responsibility as a manager was different from Smith and Snyder who worked under Claimant. More importantly, though, Claimant alone signed the affidavits providing PennDot with assurances that he would not use its time, resources or workplace for his supplementary employment. Further, only Claimant's company financially benefited from the sale of the machines, not Smith and Snyder. Although Smith testified that he expected to receive commissions from the sale, he never testified that he actually ever received any payments. Because neither Smith nor Snyder were similarly situated, Claimant's termination was not disparate treatment excusing his willful misconduct.

Claimant also argues that his conduct did not amount to willful misconduct because PennDot was aware he was using its resources, and, in fact, it paid G & S for manufacturing the components of the "side dozer." However, PennDot's termination letter to Claimant specified the following: "While the Department did have knowledge of your work on this project, we were never apprised of your intent to patent the device you developed, and convert it to your own use in connection with the pursuit of your Supplementary Employment."[5] Even though PennDot was aware of Claimant's use of its resources and paid G & S for work on the side dozer, it did so because it believed that the development of the machine was for its use and did not constitute any waiver on PennDot's part to use governmental resources for private gain.

Finally, Claimant argues that PennDot never explained the delay in terminating him from his employment even though it was aware of the "side dozer" project in 1995. While the Board found that Claimant's conduct was too remote in time from the date PennDot became aware of the invention to the time he was discharged for his conduct to constitute willful misconduct, a letter submitted into evidence that was written to the Referee by Lamonto on June 4, 1999, stated that PennDot only became aware in October 1998 that there was a problem with the patent when it received a letter from Seigworth, immediately conducted an investigation and upon its findings, terminated Claimant. While PennDot was aware that Claimant was involved with the invention of the "side dozer" in 1995, it was not aware that his conduct was in violation of the affidavits he signed until the investigation was completed in 1999 after which he was terminated.[6]

Consequently, because the evidence of record indicates that Claimant violated the terms of his affidavits regarding his supplemental employment, his conduct constitutes willful misconduct. Accordingly, the decision of the Board is reversed.

### ORDER

AND NOW, this 14th day of July, 2000, the order of the Unemployment Compensation Board of Review dated November 30, 1999, No. B–383062, is reversed.

---

5. Although Claimant alleges PennDot never specifically challenged the Board's findings on these issues, PennDot challenged the Board's determination that it did not meet its burden of proving willful misconduct. In proving that it did, PennDot has empirically challenged those findings.

6. PennDot also argues that Claimant's conduct in patenting the "side dozer" was a disregard of the standard of behavior that it had the right to expect from him under the terms of his supplemental employment request. However, based on how we have decided this case, we need not address that issue.